## Moore v. Forest Lawn Gardens, Inc.

*John A. Metz, Jr.*, for plaintiffs.
*Edwin J. Martin*, for defendant.

ADJUDICATION

ALDISERT, J., November 29, 1967.—We have before us the lengthy proceedings involving a test of Rule 3-G-(1) of the Jefferson Memorial Park. We perceive the issue to be extremely narrow; we are to determine whether the regulation is "unreasonable, a curtailment of freedom of choice in a matter of great personal concern, and a restriction not essential to the legitimate interests of cemetery management" as is the test set forth in the authoritative case of Ignatowski v. St. Mary's Polish Catholic Cemetery Company, 174 Pa. Superior Ct. 52.

These proceedings were tried simultaneously with the companion case of Dettling-Hamilton Company,

Inc. v. Forest Lawn Gardens, Inc., at January term, 1964, no. 1229, over a period commencing June 29, 1966, and concluding July 22nd. The court reporter completed the third and final of three volumes of testimony on June 29, 1967; the chancellor did not receive the last of an exhaustive series of suggestive findings, conclusions, and briefs until September 11, 1967.

After consideration of the testimony adduced at the hearing and consideration of all the suggestions offered by counsel, we make the following:

### FINDINGS OF FACT

1. Defendant, Forest Lawn Gardens, Inc., is and at all times material to this action, has been a nonprofit corporation formed under the Nonprofit Corporation Law of the Commonwealth of Pennsylvania, for the purpose of conducting or maintaining a public cemetery and, as such, conducts and maintains and has conducted and maintained a public cemetery in the County of Allegheny, Pennsylvania, and does so and has done so under the fictitious name Jefferson Memorial Park, which name it has caused to be duly registered under the Pennsylvania statute in such cases applicable.

2. Defendant Forest Lawn Gardens, Inc., was incorporated under the Nonprofit Corporation Law of the Commonwealth of Pennsylvania, on June 21, 1955, by decree of the Court of Common Pleas of Allegheny County, Pa., at July term, 1955, no. 2997 of that court for the following purpose which remains unamended, to wit:

"Buy and sell real estate and burial lots, and operate memorial parks, cemeteries, mausoleums, crematories, right to inter human bodies and disinter same, right

to sell grave markers, right to sell artificial and cut flowers, and to do all things necessary for, incidental to or convenient in the operation of the above, and to establish an endowment to effect the same".

3. Defendant, Forest Lawn Gardens, Inc., now conducts and maintains and has conducted and maintained a cemetery in Allegheny County, Pa. under the fictitious name of Jefferson Memorial Park, which name is duly registered under the applicable Pennsylvania statute.

4. Defendant, Forest Lawn Gardens, Inc., now conducts and maintains and has conducted and maintained a cemetery in Washington County, Pa. under the name of Forest Lawn Gardens.

5. Each of the original plaintiffs, to wit: Edward F. Moore and Vivian M. Moore, his wife, Harry E. Getty, Paul E. McIlvried, Henry W. Schoenefeldt and Alice W. Schoenefeldt, his wife, are lot owners in the public cemetery conducted and maintained by defendant Jefferson Memorial Park.

6. Plaintiffs Edward F. and Vivian M. Moore purchased their cemetery lots from defendant by written contract made November 16, 1959, paid for the same in installments thereafter and received their deed October 9, 1963.

7. The deed from defendant to plaintiff Harry E. Getty is dated June 3, 1954.

8. The deed from defendant to plaintiff, Paul E. McIlvried is dated February 19, 1963.

9. The deed from defendant to plaintiffs Henry W. and Alice W. Schoenefeldt is dated August 10, 1959.

10. Each of the deeds from defendant to the original plaintiffs contains the same granting clause, to wit, that defendant "does hereby bargain, sell and convey to said grantee, his heirs and assigns, for the purpose of sepulture alone, the following described lot of ground in the said Park". Each of said deeds also con-

tains a provision that the grantee is to have and to hold the lot or lots "subject at all times to any and all the rules and regulations of the said Memorial Park now or hereafter adopted for the government of said Memorial Park".

11. The intervening plaintiff, Alex Gustafson, is also a lot owner in defendant's cemetery, having become such by deed from defendant dated November 12, 1965. His deed contains the same granting clause "for the purpose of sepulture alone" and the same provision that his holding thereunder shall be "subject at all times to any and all the rules and regulations of the said Memorial Park now or hereafter adopted" which appear in the deeds from defendant to the original plaintiffs.

12. The individuals who are plaintiffs at January term, 1964, no. 1228, are lot owners in Jefferson Memorial Park Cemetery while each of the plaintiffs at January term, 1964, no. 1229, are business corporations incorporated under the Business Corporation Law of the Commonwealth of Pennsylvania engaged in the manufacture, delivery, and installation of concrete burial vaults and concrete rough boxes in cemeteries located in Allegheny County, Pa.

13. The corporate plaintiffs at January term, 1964, no. 1229, are 4 of 10 manufacturers of burial vaults who are located and do business in Allegheny County, Pa., in addition to 13 companies from surrounding counties which do business in Allegheny County, Pa. At least 10 different vault manufacturers delivered, installed and sealed their vaults in Jefferson Memorial Park prior to July 1, 1963.

14. At the times when the respective original plaintiffs purchased their said lots in defendant's cemetery from defendant and until July 1, 1963, burial vault manufacturers doing business in the area of Western Pennsylvania have, as a part of the sales which they

have made to their funeral director customers or buyers, not only manufactured the burial vaults involved but delivered the same to the particular grave site involved in the particular cemetery involved, installed said burial vault in the grave preliminary to the interment and sealed the vault after the casket was placed therein.

15. At the times when the respective original plaintiffs purchased their lots in the defendant's cemetery from defendant and until on or about July 1, 1963, defendant at all times permitted the gravesite delivery, installation and sealing of all burial vaults by the manufacturers thereof at defendant's cemetery. Burial vault manufacturers made gravesite delivery of and installed and sealed burial vaults at defendant's cemetery up to July 1, 1963.

16. Beginning on or about June 7, 1963, a five-week work stoppage occurred at the establishments of the principal vault manufacturers in Western Pennsylvania arising from a strike called by Local 341 Building Material and Construction Drivers Helpers and Material Handlers, as affiliate of the Teamsters Union, for higher wages, and during said period defendant offered to supply to funeral directors burial vaults for persons desiring to have burials in defendant's Jefferson Memorial Park.

17. Under date of June 19, 1963, while said strike was in progress, defendant sent to each of the burial vault manufacturers in Western Pennsylvania, a letter reading in part as follows:

"After long and careful consideration, Jefferson Memorial Park has decided that, effective July 1, 1963, the Park will require that the installation of every vault, concrete box, or other container for the casket, be made by our employees only.

"Beginning on the above date, vault deliveries from all vault companies shall be deposited at a specified

location in the cemetery. All deliveries shall be made no later than 24 hours before the funeral is scheduled. The cemetery will make an installation charge of $18.00 per vault and $16.00 for each concrete rough box".

18. The rule or regulation of defendant under which defendant's letter of June 19, 1963, addressed to burial vault manufacturers was issued was defendant's Rule No. 3-G(1) which reads as follows:

"Rule 3-G CONCRETE

(1) The casket of every earth interment shall be enclosed in a concrete box or vault, the installation of which shall be made by the employees of the corporation".

19. The requirement of a concrete box or vault enclosing the casket is common to all major cemeteries in the area of Western Pennsylvania, including defendant's Jefferson Memorial Park.

20. In the funeral service field in Allegheny County and the Western Pennsylvania area contiguous thereto, including the counties of Armstrong, Butler, Beaver, Washington and Westmoreland, there are and since at least 1933 have been three principal types of businesses, to wit: funeral directors, vault manufacturers and cemeteries.

21. Under date of June 21, 1963, defendant issued to all funeral directors in the area of Western Pennsylvania a letter reading in part as follows:

"Effective July 1, 1963, Jefferson Memorial Park will be instituting a new policy regarding vault and rough box placement in the Park. . . . As of July 1, the Park will require that the installation and closure of all vaults and rough boxes within the cemetery be made by Park Employees only".

22. Under date of June 27, 1963, the strike being still in progress, defendants sent to all funeral direc-

tors in the area of Western Pennsylvania a letter reading in part as follows:

"As you are aware, Jefferson Memorial Park has established regulations requiring all vault installation and closure to be performed by our employees for the protection of our Park and grounds. We have been informed by Dettling-Hamilton Company that they do not intend to comply with these regulations. Accordingly, until this matter is resolved, no Dettling-Hamilton vaults will be admitted into Jefferson Memorial Park until they agree to abide by our regulations.

"We do have on hand vaults which we have been supplying to you and other funeral directors during the present strike and will continue to have such vaults available for persons desiring to be buried in Jefferson Memorial Park.

"Please take these matters into consideration when advising bereaved families on vault selection".

23. Since July 1, 1963, and the termination of the strike defendant has been engaged in the business of selling and supplying burial vaults to funeral directors in competition with burial vault manufacturers and has also been so engaged in the business of gravesite delivery, installation and sealing of burial vaults in its cemetery known as Jefferson Memorial Park and is still engaged in doing so and will in the future, unless restrained, continue to do so. Defendant admits that unless restrained it will continue to enforce its Rule 3-G (1).

24. From and after July 1, 1963, defendant has enforced the amendment to its rules and regulations which is Rule 3-G (1) and unless restrained will continue to do so.

25. From and after July 1, 1963, defendant has by the enforcement of the aforesaid amendment to its rules and regulations prevented and denied to the lot owners in its cemetery, including plaintiffs and each

of them, the gravesite delivery, installation and sealing of the burial vaults by the burial vault manufacturer of the lot owner's choice either directly or through the funeral director and, unless restrained, will continue so to do.

26. The actions of the defendant will, unless restrained, continue to deny and deprive plaintiffs and each of them as the owners of lots in the cemetery of defendant by purchase and deed of conveyance from defendant, the gravesite delivery, installation and sealing of burial vaults by the burial vault manufacturer of the lot owner's choice either directly or through the funeral director.

27. From and after July 1, 1963, defendant has by the enforcement of its aforesaid amendment to its rules and regulations closed the roadways within the cemetery in which plaintiffs are lot owners for the purposes of the gravesite delivery, installation and sealing of burial vaults by the manufacturers thereof chosen by the lot owner either directly or through the funeral director and, unless restrained, will continue so to do.

28. From and after July 1, 1963, defendant has by the enforcement of its aforesaid amendment to its rules and regulations denied plaintiffs and each of them the right to use the roadways within the cemetery for the gravesite delivery, installation and sealing of burial vaults by the manufacturers thereof.

29. From and after July 1, 1963, defendant has by the enforcement of its aforesaid amendment of its rules and regulations imposed upon plaintiffs and each of them as lot owners in the cemetery as a condition precedent to their and each of their right of sepulture under their deeds of conveyance from defendant the acceptance from defendant in their respective lots of the gravesite delivery, installation and sealing burial vaults from and by defendant itself instead of

by and from the burial vault manufacturers of their choice either directly or through the director.

30. From and after July 1, 1963, defendant has by the enforcement of its aforesaid amendment of its rules and regulations denied to the lot owners in the cemetery, including plaintiffs, freedom with reference to the gravesite delivery, installation and sealing of burial vaults and, unless restrained, will continue so to do.

31. Dettling-Hamilton Company, Inc., Greystone Burial Vault Company, Martin Burial Vault Company, Inc., and Millvale Vault, Inc., who are plaintiffs in an action against defendant at January term, 1964, no. 1229, of this court, handled between 9,000 and 10,000 concrete burial vault and rough box interments a year in Allegheny County over the 10 years from 1953 through 1963; the volume of burials in which they supplied the vaults or boxes since the middle of 1963 has increased somewhat; and of the 1,000 to 1,100 interments at defendant's Jefferson Memorial Park Cemetery per year these 4 vault companies supplied the vaults or boxes in approximately one-half of the interments since July 1, 1963, and prior to that did so, as well as made the gravesite installations and sealings of the vaults, in about the same number of instances per year.

32. The intervening plaintiff, Axel Gustafson, had no knowledge or notice of defendant's Rule 3-G(1) in any form or by any means at the time when he purchased his lot and received his deed from defendant on November 12, 1965, and never had any notice or knowledge of the regulation until July, 1966 during the trial of this case.

33. Defendant's Rule 3-G(1) as announced June 19, 1963, and put into effect by defendant July 1, 1963, was actually adopted October 3, 1960, but never announced or put into effect by defendant until the an-

nouncement on June 19th and the putting into effect on July 1, 1963. It was informally announced at a dinner meeting earlier on June 13, 1963.

34. Defendant's Rule 3-G(1) prior to the amendment of October 3, 1960, being put into effect on July 1, 1963, was adopted by defendant and made effective January 1, 1950, and provided:

"The casket of every earth interment shall be enclosed in a concrete box or vault, the installation of which shall be made by, *or under the supervision of*, the employees of the Corporation". (Italics supplied.)

35. Defendant never seriously attempted to enforce its Rule 3-G(1) as it was between January 1, 1950, and July 1, 1963, by providing supervision of the installation of concrete boxes or concrete vaults.

36. In the mid or late 1940's, cemeteries in this area imposed restrictions upon the use of wooden rough boxes which had been used, prior to that time, as the outer container for the casket interred in the grave. Cemeteries began to require the use of concrete as an outer container for the caskets and by 1963 approximately 80 of the 465 cemeteries in this county prohibited the use of wooden boxes. A concrete rough box is a container made of concrete designed sufficiently strong to support the weight of the load so as to meet the minimal requirements of cemeteries so as to prevent the cave-in on the grave some time after an interment.

37. Jefferson Memorial Park adopted a regulation which precluded the use of wooden rough boxes which regulation went into effect in 1950.

38. The operating area of the concrete burial vault manufacturers in Western Pennsylvania comprises and since 1933 has comprised the County of Allegheny and its surrounding contiguous counties of Armstrong, Butler, Beaver, Washington and Westmoreland. There

are approximately 465 cemeteries in Allegheny County which are divided into the categories of traditional type cemeteries and memorial parks. There are approximately 400 active funeral director licenses in Allegheny County and about 300 funeral homes. In the Western Pennsylvania area, including not only Allegheny County but the contiguous counties, there are approximately 23 concrete burial vault manufacturers of which 10 are located in Allegheny County and 13 in the immediately surrounding counties. Burial vault manufacturers in the surrounding counties occasionally come in and do business in Allegheny County. The four plaintiff burial vault manufacturers in the action at January term, 1964, no. 1229, which was tried with this case are among the largest of the manufacturers in the area.

39. Both concrete burial vaults and concrete rough boxes are receptacles in which the casket is placed following the committal services at the graveside. The concrete rough box has no protective features for the contents, to wit, the casket and the remains of the deceased, except that it is so constructed as to support the overlying earth load. The concrete rough box is not sealed and the lid is merely lowered into place. The concrete burial vault on the other hand is so constructed and designed as to afford protection against both the weight of the earth load and weather and conditions under ground. It is sealed after the casket is placed therein to afford protection for the casket and remains, therein. The sealing is to protect particularly against the intrusion of water getting from the grave into the vault. Concrete rough boxes are all pretty much alike. Concrete burial vaults, on the contrary, afford varying degrees of protection depending upon their construction, weight and method of sealing.

40. The decision between the use of a concrete burial vault or concrete rough box is made by the family

of the decedent in connection with each interment and the concrete burial vaults are in all cases sold by the manufacturer thereof to the funeral director who in turn resells the same to the family.

41. In the Western Pennsylvania area of Allegheny County and its contiguous counties the following trend developed between 1933 and midyear of 1963 (July 1, 1963): In 1933 75 per cent of the interments were made in wooden rough boxes as a container for the casket and 25 per cent in burial vaults. Starting about the beginning of 1946 the cemeteries in the area began to prohibit by rule or regulation the use of wooden rough boxes and to require interments to be in concrete rough boxes. No cemetery rule or regulation in the area has ever required interments to be in concrete burial vaults. Public acceptance of the concrete burial vault increased over these years. By the middle of 1963, 75 per cent of all interments in the area were made either in concrete rough boxes or concrete burial vaults. Of this 75 per cent, 20 per cent to 25 per cent were made in concrete rough boxes and the remainder of 75 per cent to 80 per cent were made in concrete burial vaults.

42. Until July 1, 1963, when Forest Lawn Gardens, Inc. made effective its Rule 3-G(1) no cemetery in the Western Pennsylvania area of Allegheny County and its contiguous counties ever had any rule or regulation prohibiting the gravesite delivery, installation and sealing of concrete burial vaults by the manufacturers thereof. Since July 1, 1963, the only other cemetery in said Western Pennsylvania area which has adopted and put into effect any rule or regulation restricting the gravesite delivery, installation and sealing of concrete burial vaults by the manufacturers thereof is Penn-Lincoln Memorial Park which on September 15, 1964, put into effect such a regulation the validity of which is presently the subject of litigation pending in

Westmoreland County in which said cemetery is located.

43. In the Western Pennsylvania area of Allegheny County and its contiguous counties it was the universal custom, practice and usage from 1933 to July 1, 1963, and it continues to be the universal custom, practice and usage in all cemeteries in the area except at Jefferson Memorial Park and Penn-Lincoln Memorial Park that the gravesite delivery, installation and sealing of concrete burial vaults is done by the manufacturer thereof except for cases where the sealing has been done by cemetery personnel at the request of the vault manufacturer and always and without exception where the lot owner or family of the deceased lot owner desires the same to be done by the manufacturer.

44. A properly delivered, installed and sealed concrete burial vault renders real protection to the enclosed casket and remains of the deceased.

45. Careful handling of concrete burial vaults by experienced personnel with knowledge of the product and using proper equipment is of importance in the gravesite delivery, installation and sealing thereof.

46. There are three types of sealed concrete vaults used in Allegheny County which are designated by the type of seal used and these are an air seal, a concrete seal, neither of which is manufactured in Allegheny County but which are installed in Allegheny County, and the third type, manufactured by the four corporate plaintiffs as well as others, sealed by asphalt. There are various models of concrete burial vaults varying in expense which differ in the manner of installation and sealing as dictated by whether a flat lid or a dome lid is used. The greatest majority, estimated to be 90 per cent of the sealed vaults used in Allegheny County use the automatic asphalt sealer.

The asphalt sealer is applied to the concrete burial vault during the manufacturing process prior to delivery of the vault to the cemetery, and the seal is automatically accomplished when the lid or top is placed on the bottom of the vault.

47. The process of the proper gravesite delivery, installation and sealing of concrete burial vaults as practiced in the Western Pennsylvania area of Allegheny County and its contiguous counties has been and is the same in both traditional and memorial park cemeteries.

48. There are approximately 465 cemeteries in Allegheny County divided into categories of traditional and memorial park cemeteries.

49. Since July 1, 1963, the vault manufacturers have been restricted at defendant's Jefferson Memorial Park Cemetery to delivering concrete burial vaults of their manufacture, which they have sold to funeral directors, at the loading dock of the cemetery and they have been permitted no control over the delivery, installation or sealing of said vaults beyond that point.

50. The word "sepulture" which appears in the deeds of all of the original plaintiffs and in the deed of the intervening plaintiff, is defined in Webster's New International Dictionary of the English Language, G. & C. Merriam Company, 1910, as meaning:

"Act of burying the dead body of a human being; burial, interment".

51. In the opinion of funeral directors and cemetery superintendents who have been in the funeral service field in their respective capacities in the Western Pennsylvania area of Allegheny County and its contiguous counties for many years, the gravesite delivery, installation and sealing of concrete burial vaults by the manufacturers thereof is important to

insure the maximum protection for the casket and remains of the deceased therein contained.

52. Lot owners and the families of deceased persons counseling with funeral directors in the Western Pennsylvania area of Allegheny County and its contiguous counties relative to funerals express their feeling of the importance not only of the choice of a concrete burial vault as distinguished from a concrete rough box and the choice of the type of concrete burial vault desired, but the importance of the gravesite delivery, installation and sealing of the burial vault by its manufacturer. Their expressed reason for this importance is for the protection of the casket and its contents.

53. Lawn or memorial park cemeteries are more readily distinguishable from the traditional type cemetery in that the latter has upright monuments or tombstones, whereas the memorial park or lawn cemetery prohibits tombstones and requires a marker which is level with the ground.

54. Another distinguishing characteristic of the memorial park cemetery is the restriction on planting in the cemetery to conform to a master plan developed for the entire cemetery and the use of garden features in accordance with a master plan for the beautification of the entire cemetery whereas traditional cemeteries historically have not limited these matters.

55. Seven lot owners, including two of the original plaintiffs and the intervening plaintiff, and the son of a lot owner all expressed their feeling of the vital importance for the protection of the casket and remains of the deceased therein that the lot owner or bereaved family have not only the right to choose a concrete burial vault as contrasted with a concrete rough box and to choose a concrete burial vault with the maximum protective features which they can afford, but also that the concrete burial vault selected be delivered

to the gravesite, installed and sealed by the manufacturer thereof.

56. At defendant's Jefferson Memorial Park Cemetery there has been only one instance of damage claimed against any of the four vault manufacturers which are plaintiffs in the action at January term, 1964, no. 1229, to wit, Dettling-Hamilton Company, Inc., Greystone Burial Vault Company, Martin Burial Vault Company, Inc. and Millvale Vault, Inc. This covers the period 1929 to 1963.

57. Defendant's President, John D. Neel, admitted that damage is necessarily done in preparing a grave and installing a vault, that in the delivery of a vault to the gravesite heavy equipment must be used, so that even with the most elaborate care lawn sod is frequently damaged, inevitably so in damp weather, and that markers also are occasionally marred.

58. In January, 1956, Forest Lawn Gardens, Inc., increased its interment fee charged to the lot owner through the funeral director by the sum of $2 "to cover repair of lawn damage during vault deliveries" and "due to our (Forest Lawn Gardens, Inc.) increased labor and maintenance costs in repairing damage to our lawns caused by vaults being rolled to and installed at gravesites". This was done after the vault manufacturers refused to pay this charge when Forest Lawn Gardens, Inc. attempted to impose it upon them.

59. The charges of $18 and $16 respectively which Forest Lawn Gardens, Inc. announced for its services in the installation of concrete burial vaults and concrete rough boxes effective July 1, 1963, were arrived at without a time study and were based upon knowledge of installation charges theretofore made by cemeteries outside of Pennsylvania and in the eastern part of Pennsylvania. Defendant's president, John D. Neel, testified that he personally knew of charges made by

such cemeteries located outside of Western Pennsylvania in amounts of $15, $20 and $25.

60. Forest Lawn Gardens, Inc. has never adopted any rule or regulation mandating any general or specific procedure or equipment to be used by concrete burial vault manufacturers in the gravesite delivery, installation and sealing of concrete burial vaults in Jefferson Memorial Park. It has never attempted to regulate or govern the conduct of vault company personnel within the cemetery grounds. It has never adopted any regulation prohibiting the use of dollies or trucks without rubber tires or equipment without rubber tires. It has never issued any regulation forbidding vault company personnel from loitering in the cemetery premises outside of the service area. It has never adopted any kind of a rule or regulation dealing with the subject of damage to turf or roadway done by a vault company. It has never adopted any rule or regulation limiting the number of vaults that could be brought in the cemetery by a vault company truck. Nor has it ever adopted any rule or regulation limiting the weight of vehicles and loads thereon which could use the cemetery roadways. It never even exercised the supervisory power which it reserved to itself under its Rule 3-G(1) as it was in effect between January 1, 1950, and July 1, 1963, providing that the installation of concrete burial vaults or boxes should be done "by, or under the supervision of" cemetery employes.

61. To the families of deceased persons, to cemetery lot owners and to human beings generally the choice of a concrete burial vault as against a concrete rough box, the choice of a particular concrete burial vault and the choice of the entity which shall be charged with the gravesite delivery, installation and sealing of that burial vault in the conduct of a funeral and interment are matters which may be of great personal concern

and importance for the protection of the remains of the decedent.

62. On July 1, 1963, in the Western Pennsylvania area of Allegheny County and its contiguous counties of Armstrong, Butler, Beaver, Washington and Westmoreland, the gravesite delivery, installation and sealing of concrete burial vaults by the manufacturers thereof was a recognized and permissible part of the customs, usages and practices relating to sepulture.

63. The most carefully, skillfully and expensively manufactured concrete burial vault can be rendered worthless by mishandling, wrong installation or defective sealing.

64. The gravesite delivery, installation and closing of burial vaults and rough boxes prior to July 1, 1963, involved three distinct stages which were the delivery of the vault or box from the truck parked on a cemetery roadway to the gravesite, installation of the vault or box in the grave which had been dug to receive it both of which are accomplished prior to the interment, and third, the placing of the lid on the vault or box after the interment which accomplished the sealing thereof.

65. The process in the sealing of all vaults manufactured by the plaintiff corporations which use the asphalt sealer is automatically accomplished when the lid of the vault is placed on the receptacle part of the vault after first making certain that the upper edges of the receptacle are free from dirt and stones and making certain that the lid is placed thereon.

66. Rule 3-G(1) of Jefferson Memorial Park Cemetery was adopted by the unanimous vote of the Board of Trustees of Forest Lawn Gardens, Inc., in October 1960, and made effective July 1, 1963, after acquisition of the necessary equipment and after notification to all burial vault manufacturers in the Allegheny County area.

67. Most other services such as grave digging, supplying tents and lowering devices and filling of the graves are performed by cemetery employes and it is more efficient to require installation and sealing by these employes without interruption of the orderly work schedule of cemetery employes.

68. For some time prior to October 1956, vault companies had paid the sum of $2 to Jefferson Memorial Park for every vault delivered to the cemetery. The amount of $2 per vault installation was billed monthly by Jefferson Memorial Park to Dettling-Hamilton Company and paid each month until July 1, 1963. Defendant concedes "there is no doubt that the payment historically was a gratuity" to employes of the cemetery.

69. In January 1956, Jefferson Memorial Park attempted to increase the charge of $2 to an amount of $4 to be charged for the installation of each vault in the cemetery without further restriction on the activities of vault dealers in the cemetery.

70. Under date of January 11, 1956, defendant sent to vault manufacturers of Allegheny County including Dettling-Hamilton, a letter reading in part as follows:

"Due to our increased labor and maintenance costs in repairing damage to our lawns caused by vaults being rolled to and installed at grave sites, we are forced to increase our charges for vault installation from two dollars to four dollars for each vault delivered and installed in the park".

71. Under date of February 1, 1956, an explanation of the increased charges was sent to the funeral directors of Western Pennsylvania by letter from defendant reading in part as follows:

"However, it has been brought to our attention that one item of cost — the $4.00 fee to vault suppliers — might affect you indirectly, and we want to do you the courtesy of explaining it.

"As you know, the care of lawns and Bronze Memorials in a cemetery such as Jefferson must be meticulous. In the delivery of a vault to the gravesite, heavy equipment (either truck or dolly) must be used. Even with the most elaborate care, lawn sod is frequently damaged — and inevitably so in damp weather. Markers also are occasionally marred.

"By well-established custom, covering a period of over ten years, the expense of repairs has been passed along to the vault company as a fee, since we have no financial stake in vault sales. Examination of this item revealed that our $2.00 fee did not begin to cover repair costs. An adjustment was in order and the fee was raised to $4.00".

72. Because of objections to the increase in the $2 charge by vault manufacturers in 1956, the increased charge was withdrawn by Jefferson Memorial Park, after discussions with representatives of the vault manufacturers and with the understanding that the vault companies had agreed to pay $2 as a vault installation charge. There was no reply to the letter dated March 9, 1956, by the vault manufacturers and the amount of $2.00 was paid from 1956 to July 1, 1963.

73. Under date of March 9, 1956, defendant sent to the funeral directors of Western Pennsylvania a letter reading in part as follows:

"Therefore in the interest of harmonious trade relations, our charge to the vault companies has been reduced to the original amount of $2.00, which they have agreed to assume, and our overall interment fee has been adjusted accordingly as you will note on the enclosed printed schedule, which supersedes the one dated January 31, 1956".

74. The effect of Rule 3-G(1) of Jefferson Memorial Park adopted in 1960 and made operative July 1, 1963, was to require that all vault manufacturers de-

liver their products, vaults or boxes, to the services area of Jefferson Memorial Park by a public road, rather than to the site of the grave and to require that the employes of Jefferson Memorial Park deliver concrete vaults and concrete rough boxes from the service area to the grave, make the installation in the grave and complete the closing, or sealing, after the funeral service at gravesite.

75. Effective July 1, 1963, defendant Forest Lawn Gardens, Inc., enforced its rule which it had announced would be made effective on that date and which is numbered Rule 3-G(1) and required that the installation of any concrete enclosure in a grave in its cemetery be made by its employes.

76. John D. Neel, President of Forest Lawn Gardens, Inc., announced that Rule 3-G(1) would be enforced at a dinner meeting to which all burial vault manufacturers were invited which meeting was held on June 13, 1963, at the South Hills Country Club after notification of all burial vault manufacturers by a letter dated June 4, 1963.

77. The written invitation to all burial vault manufacturers to attend a dinner at the South Hills Country Club on June 13, 1963, dated June 4, 1963, was sent prior to a work stoppage of five weeks' duration which occurred at the establishments of the principal vault manufacturers in Western Pennsylvania arising from a strike beginning on or about June 7, 1963.

78. After the dinner meeting held June 13, 1963, written notification of the effect of Rule 3-G(1) was given by letter dated June 21, 1963, from the defendant to all funeral directors in the area of Western Pennsylvania, which letter reads in part as follows:

"Effective July 1, 1964, Jefferson Memorial Park will be instituting a new policy regarding vault and rough box placement in the Park . . . As of July 1, the Park will require that the installation and closure

of all vaults and rough boxes within the cemetery be made by Park employees only".

79. Under date of June 19, 1963, defendant sent to each of the plaintiff vault manufacturers a letter reading in part as follows:

"After long and careful consideration, Jefferson Memorial Park has decided that, effective July 1, 1963, the Park will require that the installation of every vault, concrete box or outer container for the casket, be made by our employees only.

"Beginning on the above date, vault deliveries from vault companies shall be deposited at a specified location in the cemetery. All deliveries shall be made no later than twenty-four hours before the funeral is scheduled. The cemetery will make an installation charge of $18.00 per vault and $16.00 for each concrete rough box".

80. Vault manufacturers generally used "U" plate trucks prior to July 1, 1963, which weighed one and one half tons and each box or vault weighed approximately one ton. Two vaults are carried on each such truck.

81. Newer trucks (known as "A" frame or "boom" trucks) are heavier and carry four vaults per trip, and each vault weighs approximately one ton.

82. By the testimony of plaintiffs' witnesses, concrete rough boxes have always been closed by cemetery personnel.

83. It was stipulated that six lot owners would testify for defendant that in their opinion the question of who performs the gravesite delivery, installation and sealing of a concrete burial vault was not important and that the gravesite delivery, installation and sealing of burial vaults was not discussed with them by funeral directors at the time arrangements were made.

84. The use of concrete burial vaults has been fostered by the regulation of most cemeteries which required the use of concrete outer containers after World War II to the exclusion of other containers such as wood and steel, and the use of concrete burial vaults has increased since that time.

85. Jefferson Memorial Park issues a guarantee to its lot owners on all vaults delivered, installed and sealed by its employes since July 1, 1963, even though supplied by other manufacturers.

86. The vault manufacturer is seldom called upon to give a written guarantee for their vaults and they are issued only on request, but by the terms thereof these documents guarantee only materials and workmanship and not sealing of the vault.

87. Regardless of who delivers, installs and seals a vault, water may get into the vault.

88. The funeral director has an economic interest in the sale of a vault because of the profit therefrom and the more expensive the vault the more profit is involved. There is more profit from the sale of a vault than from the sale of a concrete rough box.

89. Employes of vault manufacturers have historically supplied free services for the funeral directors which include tents and lowering devices, when requested by the funeral director and have supplied other free services to aid the funeral director in other cemeteries and in Jefferson Memorial Park.

90. Funeral directors present a statement of funeral charges to the families that they counsel which contains the cost of the vault with the cost of delivery and installation of the vault included in the lump sum amount charged for the vault.

91. The charge for installation of vaults and boxes in Jefferson Memorial Park after July 1, 1963, has been billed by the defendant to the vault manufacturer.

92. The charge for installation of vaults and boxes is billed separately by the vault manufacturer to the funeral director only in Jefferson Memorial Park since July 1, 1963 without reduction in the amount of $2 which amount was paid prior to July 1, 1963, but has not been paid to Jefferson Memorial Park since that date.

93. Since July 1, 1963, the vault manufacturer has made no reduction in the amount charged for a vault delivered, installed and sealed in Jefferson Memorial Park even though it has not paid the $2 amount paid prior to that date to the cemetery.

94. Since July 1, 1963, funeral directors have been collecting the amounts shown on separate bills of the vault companies for delivery, installation and sealing of vaults in Jefferson Memorial Park from the families involved.

95. Prior to July 1, 1963, vault manufacturers did not bill funeral directors separately for the $2 paid to Jefferson Memorial Park in the installation of vaults.

96. Since July 1, 1963, the vault manufacturers bill separately for delivery, installation and sealing charges in Jefferson Memorial Park to the funeral directors, and the defendant permits the vault manufacturers to do business in its cemetery, with the understanding that the money for such charges will be held in escrow pending the outcome of this litigation.

97. Regulation 3-G(1) does not restrict the purchase of any particular concrete vault or rough box from any particular manufacturer or supplier thereof.

## DISCUSSION

We are to decide whether Rule 3-G(1) is reasonable under the tests previously enunciated by the courts. Effective July 1, 1963, this rule of defendant cemetery corporation provides:

"The casket of every earth interment shall be enclosed in a concrete box or vault, the installation of which shall be made by the employees of the corporation".

This type of case brings into conflict rights of the lot owners, possessed of privileges conferred by ownership of the lot, and of the cemeteries who are privileged to promulgate reasonable rules and regulations, within certain limits, for the operation of the cemetery.

In 14 Am. Jur. 2d "Cemeteries" — "Right of Burial", 737, §31, the generally recognized rules on this subject are summarized in the following language:

"B. RIGHT OF BURIAL, §31. Generally.

"The right of a purchaser of a burial lot is not an absolute right, and is terminated on the discontinuance of the cemetery by the public authorities. It follows that the right of burial in a cemetery is not an absolute right of property, but merely a privilege or license, to be enjoyed so long as the place continues to be used as a burial ground, subject to municipal regulations and control and legally revocable whenever the public necessity requires. Moreover, a certificate which declares that the holder is entitled to a certain lot in a cemetery, to be used for burial purposes only, gives a right of burial which is limited to the interment of human bodies.

"Subject to the limitations above stated, *the ownership of a lot in a cemetery gives a right of burial therein which the cemetery association may not deny or abridge unreasonably, in the absence of a limitation existing at the time of the purchase of such lot. The right to bury carries with it the right to do so according to the usual custom in the neighborhood. Such right, however, may be subject to reasonable rules and regulations on the part of the cemetery authority. Much depends, in determining whether the right of burial is subject to the regulations, on whether they*

*were in effect at the time of the acquisition of the lot and the purchaser had knowledge thereof"*. (Italics supplied.)

We are called upon to adjudicate, therefore, two separate questions of law:

1. The validity of Rule 3-G (1) as against lot owners who received their deeds or purchased their lots before July 1, 1963, the effective date of the rule.

2. The validity of the same rule against lot owners who received their deeds and purchased their lots subsequent to July 1, 1963, but without notice or knowledge of the new regulation.

The following principles of law are appropriate in a consideration of the matter before us:

1. A cemetery has the right to adopt reasonable regulations to govern the conduct of business and to promote the orderly administration of its operation of the cemetery: Benson v. Laurel Hill Cemetery Co., 68 Pa. Superior Ct. 242.

2. These regulations may provide that interments be made in an enclosure of stone, brick or concrete: Dries v. Evans Cemetery Company, 109 Pa. Superior Ct. 498.

3. These regulations may not, however, interfere with the right of the owners or his agents to beautify or decorate graves: Benson v. Laurel Hill, supra.; nor may they curtail "freedom of choice in matters connected with the conduct of a funeral and interment": Campbell v. Neshannock Presbyterian Church, 153 Pa. Superior Ct. 246; nor may they require lot owners to pay an endowment for perpetual care as a condition precedent to erecting a monument: Slifer v. Greenmount Cemetery Company, 164 Pa. Superior Ct. 534.

4. These regulations may require purchase from the cemetery of services of a lowering device, tent and artificial grass on the theory that these are not matters

of "vital importance" to the lot owner, Campbell v. Neshannock Prebyterian Church, supra; but may not require the purchase of a cement burial vault from the cemetery because this requirement is "unreasonable, a curtailment of freedom of choice in a matter of great personal concern, and a restriction not essential to the legitimate interests of cemetery management": Ignatowski v. St. Mary's Polish Catholic Cemetery Co., supra, p. 56.

It must be emphasized, however, that these regulations are all modifications of what we perceive to be basic rights of the lot owners:

"The right to bury carries with it the right to do so according to the usual custom in the neighborhood": 14 Am. Jur., supra.

"The right carries with it the privilege to bury according to the usual custom in the neighborhood . . .": 14 C. J. S. Cemeteries §91.

There is no dispute as to the "usual custom in the neighborhood" prior to the enactment of the rule in the defendant's cemetery. The neighborhood involved is the Western Pennsylvania area, including the counties of Allegheny, Beaver, Butler, Washington, and Westmoreland. A veritable volume of testimony was introduced, and it was not rebutted, that in this "neighborhood" on the date the new rule went into effect, the gravesite delivery, installation and sealing of concrete burial vaults by the manufacturer was a recognized and permissible part of the customs, practices, and usages of sepulture. The right to bury carried with it the right to such gravesite delivery, installation and sealing of concrete burial vaults by the manufacturer. This custom was so uniform in this "neighborhood" that the testimony disclosed that only the defendant and one other cemetery has adopted the rule, and the rule in the other cemetery is also under attack in the courts.

The new practice of the cemetery made obligatory by the new rule brings about a radical and fundamental change in the burial customs in Western Pennsylvania. It removes from the funeral director and vault manufacturer the right to place and to seal the receptacle into which the casket and last remains of the decedent are placed, and it declares that only employes of the cemetery may now perform these functions.

Recognizing that the right of burial according to the usual custom of the neighborhood may be subject to reasonable modification by rules and regulations on the part of the cemetery, we now turn our inquiry to the reason assigned for the adoption of the new rule.

The five problems the cemetery sought to solve by putting into effect its new rule were: (1) Better control of cemetery personnel and others coming into the cemetery as compared to lack of control over personnel of vault manufacturers, (2) use of roadways by vault dealers and resultant damage and repair of roads, (3) damage to adjoining lots by vault company personnel, (4) damage to graves en route from roadway to the gravesite, and (5) the effect on the proper decorum of the cemetery by vault company personnel and the resultant offenses to the sensibilities of people having funerals.

As impressive as these reasons may be, we are not at all certain they are persuasive enough to justify the promulgation of the rule under attack. We must decide whether to obtain the announced objectives, the cemetery has, in effect, curtailed the "freedom of choice in matters connected with the conduct of a funeral and interment": Benson v. Laurel Hill Cemetery Co., supra. We will not examine the question of whether other rules could not in fact have been promulgated by the cemetery to achieve the desired objectives without going to the extreme of proclaiming that an agent or representative selected by the lot owner

could not perform the final act of closing and sealing the receptacle which receives the casket of decedent.

There was abundant testimony, much of it repetitious, but on balance, extremely cumulative, from a large number of funeral directors who indicate that the instrumentality of the concrete burial vault is extremely important today, that its purpose is to provide protection against the earth's crushing the casket and to provide as reasonable as possible protection against the invasion of water into the casket, that the selection of a burial vault and the considerations attendant thereto are of paramount importance, and that they and their clients rely upon the construction and installation of these vaults by the duly authorized representatives of the manufacturer.

The weight of the testimony in this lengthy and prolonged hearing which ran to 1,485 pages compels the conclusion that the handling of the concrete burial vaults by the representatives of the vault manufacturers was a matter of "personal or familial concern in the conduct of the funeral and the interment": Ignatowski v. St. Mary's Polish Catholic Cemetery Co., supra, p. 54. To deny the lot owner this privilege is to create a fundamental encroachment into his basic burial rights.

In the Ignatowski case, supra, the Superior Court struck down a regulation which required a lot owner to purchase his burial vault from the cemetery corporation. The case contained this significant language on pages 54-55:

"In its opinion dismissing plaintiff's exceptions to the chancellor's decree nisi, the learned court below said 'The vestments of the corpse including the clothing wherein it is attired, and the casket wherein it is deposited have . . . always been considered an incident necessarily attached to the rights of burial. It appears to us that the vault is something entirely dif-

ferent. . . ' . The court cites *Campbell v. Neshannock Presbyterian Church*, supra, in which we said, at page 249 : 'It could hardly make any difference to lot owners whether the lowering device, tent, and artificial grass are chosen by the corporation or by the funeral director, that is not a matter of vital importance'. The court below concludes that this protection 'is equally true if we substitute for the words, "lowering device, tent and artificial grass", the words "concrete vaults".' We do not agree with this conclusion. *We believe, on the contrary, that the selection of a vault is a personal matter, differing not merely in degree but in kind from the rental of impedimenta incidental to a funeral service.*

" . . . The testimony in the record reveals that *there are several different types of standard vaults manufactured. Each may meet the requirements of cemetery authorities and still differ from the others in weight, thickness, details of construction, durability and cost. These considerations may be of vital importance to those who would preserve inviolate the remains of their loved ones in the grave.*

" . . . *We hold this regulation to be unreasonable, a curtailment of freedom of choice in a matter of great personal concern, and a restriction not essential to the legitimate interests of cemetery management*". (Italics supplied.)

If the regulation is a curtailment of freedom of choice in a matter of great personal concern *and* a restriction not essential to the legitimate interests of cemetery management then it is "unreasonable". The overwhelming testimony in this case clearly shows that only the defendant and one other cemetery are utilizing such a regulation in this area under the guise of "legitimate cemetery management". We conclude that such a regulation is not reasonable, that the legitimate

interests of cemetery management could be achieved by regulations which do not infringe upon matters "of personal or familial concern in the conduct of the funeral and interment".

Accordingly, we shall enter a decree declaring that the rule is unenforceable as against lot owners who purchased their lots prior to the effective date of the rule and also as against those owners who purchased subsequent to the rule but without knowledge or notice thereof.

## CONCLUSIONS OF LAW

1. This court sitting in equity has jurisdiction of this action brought by lot owners in a cemetery seeking injunctive relief against the enforcement of a rule or regulation adopted by the cemetery corporation.

2. Rule 3-G(1) adopted by Forest Lawn Gardens, Inc. and made effective July 1, 1963, unreasonably curtails and denies to lot owners who were granted their lots for the purpose of sepulture in the Jefferson Memorial Park Cemetery or purchased the same prior to July 1, 1963, freedom of choice in the gravesite delivery, installation and sealing of concrete burial vaults therein.

3. Rule 3-G(1) adopted by Forest Lawn Gardens, Inc. and made effective July 1, 1963, is an unreasonable and invalid derogation from the grants of the right of sepulture made by Forest Lawn Gardens, Inc. to lot owners in Jefferson Memorial Park Cemetery who purchased the same prior to July 1, 1963.

4. Rule 3-G(1) adopted by Forest Lawn Gardens, Inc. and made effective July 1, 1963, unreasonably curtails and denies to lot owners who were granted their lots for the purpose of sepulture in Jefferson Memorial Park Cemetery on or after July 1, 1963, without notice or knowledge of said rule, freedom of

choice in the gravesite delivery, installation and sealing of concrete burial vaults therein.

5. Rule 3-G(1) adopted by Forest Lawn Gardens, Inc. and made effective July 1, 1963, is an unreasonable and invalid derogation from the grants of the right of sepulture made by Forest Lawn Gardens, Inc. on or after July 1, 1963, to lot owners without notice or knowledge of said rule.

6. Forest Lawn Gardens, Inc. should be enjoined from enforcing its Rule 3-G(1) against any lot owners in Jefferson Memorial Park Cemetery who were granted their lots for the purpose of sepulture in said cemetery or purchased the same prior to July 1, 1963, including the original plaintiffs in this case.

7. Forest Lawn Gardens, Inc. should be enjoined from enforcing its Rule 3-G(1) against any lot owners who were granted their lots for the purpose of sepulture in Jefferson Memorial Park Cemetery on or after July 1, 1963, without notice or knowledge of said rule, including the intervenor plaintiff in this action.

### DECREE NISI

And now, to wit, November 29, 1967, after hearing and consideration of the suggested findings of fact, conclusions of law, and briefs, it is ordered, adjudged, and decreed, that defendant, Forest Lawn Gardens, Inc., be and the same is hereby enjoined from enforcing its Rule 3-G(1) against any lot owners in Jefferson Memorial Park Cemetery who were granted their lots for the purpose of sepulture in said cemetery or purchased the same prior to July 1, 1963, including original plaintiffs in this case, that defendant be and is hereby enjoined from enforcing the rule against any lot owners who were granted their lots in the cemetery after July 1, 1963, without knowledge or notice of the rule, including the intervenor plaintiff in this action.